MEMORANDUM OF DECISION
On March 24, 1997, the Department of Children and Families, hereafter "DCF" filed petitions for the termination of the parental rights of Angela D. and Steven S. to their son, Adam S., born May 5, 1991. Adam has been committed to the care and custody of DCF since January 19, 1996 when he was adjudicated a neglected and uncared-for child. He was placed with his maternal great uncle and aunt, where he remains to the present. His relatives wish to adopt him.
The court finds that both parents were served, have appeared and have court-appointed counsel. The court further finds that it has jurisdiction in this matter and there is no pending action affecting custody of Adam in any other court.
The allegations against both biological parents are that Adam has previously been adjudicated neglected and that each of the parents has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, each could assume a responsible position in his life. Connecticut General Statutes § 17a-112 (c)(3)(B). Further, DCF alleged that Steven S. had abandoned Adam, in that he has failed to maintain a reasonable degree of interest, concern and responsibility for the welfare of the child. Connecticut General Statutes § 17a-112 (c)(3)(A). While other grounds were alleged, none were claimed at trial and the court treated them as withdrawn.
On the eve of the first date set for trial on January 5, 1998, Angela D. was injured and hospitalized. Her condition was poor and her already limited ability to function was severely compromised. At that time, based on the representations of counsel, the matter was continued for a competency evaluation at such time as she recovered sufficiently to be evaluated. Angela D., from the evidence, has suffered from anoxic encephalopathy with bilateral basal ganglia infarcts.[2] She is incapable of caring for herself and requires assistance and supervision. She attended the trial in a wheelchair and had the assistance of her nurse, her court-appointed guardian ad litem and her counsel, as well as the conservatrix appointed by the Probate Court. Dr. Schroeder, the examining psychiatrist, testified that he had seen Angela D. on four occasions since February of 1998. He stated that her mental status had improved remarkably since the incident, but that in his opinion she did not understand the nature of the proceedings, could not recall her lawyer's name and CT Page 4220 did not understand that termination of parental rights was permanent. He found that her short term memory was poor and that she could not concentrate. He concluded that she was not competent to proceed to trial. He also stated that he could not state, to a reasonable medical probability, that giving her more time would improve her present functioning, although improvement was possible. Based on the testimony, the court concluded that the mother was not legally competent. Dr. Schoeder, when asked as to what, if any steps could assist mother at the present time, testified that if the court proceedings were carefully and simply explained to her and she were provided frequent recesses, this would be helpful. The court adopted these suggestions and provided the mother with many recesses during trial. Both her guardian and her attorney were given time to explain the court proceedings to her. Both requested a further continuance for Angela and raised issues about her due process rights in these termination of parental rights proceedings, which rights will be addressed below.
During the trial, the court heard testimony from five witnesses: the foster father; the DCF case worker; the child's therapist; Dr. Nancy Randall, the court-appointed psychologist who evaluated the parents and the child; as well as the psychiatrist performing the competency evaluation. The court received twelve exhibits into evidence including the social study, an addendum and the report of the evaluators. Both parents, through their counsel, contested the petition. From the evidence, the court makes the following factual findings and the inferences reasonably supported by the evidence.
1. FACTS
Steven S. and Angela D. first met in 1990 and were together until 1996 with separations at various times. Theirs was a volatile relationship, characterized with arguments, domestic violence, chaotic living conditions and Angela's continuing drug abuse and attendance at both in-patient and other treatment programs. Steven S. is the father of another child by a marriage which ended in divorce before his relationship with Angela began. He has no contact with his daughter and has not been able to sustain any contact with his son, Adam.
Since Adam was placed in January of 1996, his father has had limited contact with DCF and no visitation with his son. He has not kept them appraised of his whereabouts, did not call to CT Page 4221 inquire about the welfare of his son and has not taken the steps necessary to be able to see him. He has sent no support, cards or gifts except one Christmas gift through Angela. He has not contacted Adam's foster home except once after the child's placement. He has also not received any mental health assistance to deal with his admitted extreme anxiety and other emotional difficulties.
When Steven S. was evaluated by Dr. Nancy Randall, a court-appointed psychologist, she found that:
"Mr. S. is an anxious man who has difficulty dealing with even minor stressors in his life. He has few personal resources for coping with problems and lacks outside supports to help him, either. . . . Mr. S. has little insight into his psychological issues, other than to be aware that he is anxious and uncomfortable in many situations." She found him to have a significant thought disorder and to show paranoid tendencies. She stated that "Mr. S. loves his son and wants his son to be raised in a good environment. He accurately reported that he is not able to care for his son at this time." She concluded on January 15, 1998, "It is not likely that Mr. S. will ever have the psychological capacity to raise his son in a healthy fashion."
Steven S.'s inability to address his multiple issues as well as Angela's deficits and inability to parent Adam are apparent in the many services which were provided to this family from the time of Adam's birth. Those services included parenting education at the Klingberg Family Center, a parent aide in the home as well as the services of the Visiting Nurse Association when Adam showed signs of being a "failure to thrive" baby. The VNA also made sure over the course of several years that Adam received proper medical care, as Angela was unable to take care of herself, let alone an infant or a toddler. During these years, despite his awareness of Angela's deficits, Steven worked many long hours, leaving Angela and their child to cope by themselves.
Adam also received services from the Department of Mental Retardation and the Birth to Three program as he was developmentally delayed. He received and continues to receive special education services. Despite all the services to the family, Adam's childhood was chaotic and neither parent was able to take care of his needs. That his mother was unable to do so was predicted even prior to Adam's birth when her mental health and psychiatric condition had already raised serious concerns. CT Page 4222 Dr. James Carone of Hartford Hospital in 1990 stated:
 "Ms. D. has been a severely disturbed person throughout her adolescence and young adulthood. This disturbance has been marked by psychiatric, emotional and substance abuse problems. My major concerns regarding her psychiatric status revolve around her impulsiveness, her poor social judgement and common sense . . . Also there is a tendency to distort the truth . . . This coupled with what I have said about her medication all add up to a picture of an individual . . . who is not adequately prepared to meet the demands of parenthood."
Dr. Nancy Randall, who also evaluated Angela, testified at trial that in 1997, some seven years later, in her opinion, Angela could not safely parent a child under ten years of age because of a number of factors. "She is intellectually limited, her judgment with regard to social issues is quite poor, she did not accept responsibility for her conduct and could not protect Adam from partners who might treat him badly in the future." During her evaluation, Angela admitted that Adam told her his father sexually abused him. Angela said she confronted Steven, who neither admitted nor denied Adam's statements. Even after this, however, she did not leave him and Adam's behavior deteriorated. The child became physically violent, his mother reported, and he demonstrated the sexual things his father had done. When Dr. Randall was questioned about what might help Angela to become a better parent, she concluded that more parenting classes and therapy would not help, as Angela was not motivated to change since she did not feel there was anything wrong in the first place. In her written evaluation, Dr. Randall found:
"Significant issues with Ms. D. appear to be her limited cognitive functioning and her confusion. She has a difficult time understanding things, even when they are explained to her. Several times during the evaluation, things were explained to her repeatedly, with no apparent gain in understanding. It appears that generally she simply gives up, though she may leave one with the impression that she understands what she had just been told."
The extent of the chaos in the home and each parent's inability to parent Adam has become starkly visible since Adam's removal from that home. His grand uncle testified as to the highly sexualized behaviors Adam exhibited when he first came to his house. He stated that the child put objects including a CT Page 4223 pencil in his anus and then spread the resulting feces around, stating that his father taught him to do this. He asked his uncle and aunt to fondle his penis. In an attempt to comfort his great aunt, he touched her breasts, saying that he wanted her to feel good. He would also hump his great uncle's leg. He exhibited an attenuated sexual awareness far beyond his years and his delayed development.
His disclosures about his father were also made to his therapist. His mother, when confronted with this information, admitted that Adam and his father often slept in one bed in the home. Adam has repeatedly and graphically shown by his acts that he had been exposed to inappropriate sexual behavior and abuse while in the home with his biological parents. As there has been no contact between him and his son in over two years, the child has not had to confront these issues directly by seeing his biological father.
Over time, Adam's sexualized behaviors have lessened. He has continued to have contact with his mother, who has also made attempts to fulfill the court expectations set for her. Contact with his mother, has, however, been stressful for him. As his therapist testified, he had crying episodes after visitation with his mother, wet himself, had trouble sleeping and was very fearful. She referred the child for medication because his symptoms initially were so severe. Because of his symptoms, visitation with his mother ended in August of 1996. Adam's therapist was not aware of any concern that Adam suffered from mental retardation, stating that she treated him during her sessions for Post Traumatic Stress Disorder.
At present, Adam receives the regular attention of his maternal great uncle and aunt, special education services at school including physical therapy, speech therapy and occupational therapy. He is seen by the school psychologist and has a special education teacher. He is improving in his ability to perform the school tasks required of him. His great uncle works with him to help him to write. His great uncle testified that Adam is becoming a more normal little boy, expressing fewer fears and sexualized behaviors. He does not talk about his parents. Adam has never expressed any desire to return to his parents; not to the DCF social worker, his therapist or his great uncle and aunt, who wish to adopt him. He relates to them as "Mom" and "Dad" and on the few occasions when he has seen his mother, he is agitated and upset. CT Page 4224
As previously noted, Adam and his biological parents received extensive services from May of 1991, the time of his birth. Those services have included individual counseling at Day Kimball Hospital Mental health services for the mother and individual counseling at the same facility for Steven S. in August of 1992. Also offered were the services of a parent aide in the home beginning in 1991 which ended in 1993, when Angela and Steven refused further services. Also offered were the services of "Families in Training" for parenting assistance as well as case management services by United Services, the provider for the region in which they reside. Angela also received inpatient substance abuse treatment at Day Kimball Hospital, a referral to Milestone, a facility for long term inpatient substance abuse treatment and Pathways, another program for inpatient substance abuse treatment as well as services for such treatment from Cedarcrest Hospital. None of those services, including out-patient substance abuse treatment, have helped her to overcome her addiction problems for any length of time. Since Adam's removal from the home, his father has never been available to benefit from services offered. Even during the time the family resided together, as early as 1993, Steven S. was hostile to such service. On December 20, 1996, at a hearing on the extension of Adam's commitment to DCF, further reunification efforts were found not appropriate (Peck, J.).
2. RESPONDENT MOTHER'S INCOMPETENCY
At the commencement of the trial, the court concluded that due to Angela D.'s recent injury, she was not competent. A guardian ad litem had previously been appointed for her. The court had continued the matter for a period of three months from the initially scheduled trial date and ordered a competency evaluation to be performed. The evidence at the trial established that prior to the incident of January 5, 1998, which gave rise to Angela's present medical difficulties, Angela functioned in the borderline intelligence range and received services from the Department of Mental Retardation.
In making its decision to proceed to trial and to grant no further continuances for Angela D. to regain her competency, the court reviewed the case of In re Alexander v., 223 Conn. 557,564, 613 A.2d 780 (1993). In examining the due process issues implicated, our Supreme Court found that "there is a cognizable risk that a parent unable to assist his or her attorney or to CT Page 4225 understand the proceedings might suffer an erroneous termination of parental rights regardless of whether a guardian ad litem has been appointed pursuant to Connecticut General Statutes § 451-708(a)." In re Alexander v., supra, 563. In weighing that risk, the court had reviewed the procedural safeguards set forth in Matthews v. Eldridge. 424 U.S. 319, 96 S.Ct. 893 (1976) as providing assistance in the decision to proceed with the trial. As previously found in the case of In re Aida M. and Carmelo O.,
Superior Court for Juvenile Matters, H12-CP96-000640, and H12-CP96-00064 (March 25, 1997, Foley J.), the court concludes that the multi-factored balancing test set forth in Matthews must be considered to ensure that all due process rights of the incompetent parent have been addressed before proceeding to a trial on the merits. It is an effort to balance the interests of the incompetent mother in maintaining her family free of coercive state interference with the interest of Adam in a safe and healthy childhood.
The first of the four concerns in Matthews is:
1. "Is it likely that the evidence presented could be refuted be a competent parent?" In this case, serious and pervasive concerns about the mother's mental ability to care for a child were raised while the child was still in utero. Angela's mental functioning almost seven years ago was inadequate to provide for the care of a young child and if Steven S. had not agreed to care for him, it appears likely Adam might never have been released to his mother from the hospital in which he was born. Angela was never able to care for her son unassisted. Even if she were to recover to the point of mental competence, her underlying issues would not be eliminated. When she was evaluated by Dr. Randall even before her injury, Dr. Randall found her limited and her ability to understand compromised. The court concludes that if Angela were restored to competence, her restoration would not alter the well-established history of dysfunction and non-parenting, nor would it lead to her rehabilitation within the meaning of Connecticut General Statutes § 17a-112 (c).
2. The second concern is "whether the parent could be restored to competence within a reasonable time, considering the age and needs of the child?" The court-appointed psychiatrist testified that recovery from brain injuries is notoriously hard to predict and he did not know whether any further recovery was possible. In view of the fact that Angela, preincident, was competent. but not able to care for the child and that Adam has CT Page 4226 been in care for over two years as well as the nature and extent of the parenting deficits of this family, the court must answer that restoration to competency cannot be achieved within a reasonable time, if ever. In the meantime, Adam has present real permanency needs. The care and nurturing he has received and the recovery he has made should not be compromised by the remote chance for his mother's future recovery, which cannot be predicted.
3. "If the mother were competent, is there proof of the existence of or prospect of an existing parent-child relationship?" As the testimony has shown, even seeing Angela disturbs Adam, who does not have positive memories of either parent. The court concludes that there is no on-going relationship and that the mother's incompetence is not a relevant factor in that determination or the evidence presented to the court.
4. "Was the respondent mother effectively represented by counsel and the guardian ad litem, given the difficulties attendant to such representation?" In this case, prior to the date originally scheduled for trial, counsel and the guardian were prepared to proceed to trial and had already completely formulated, with the assistance of their client, a trial strategy and plan. At the rescheduled trial, counsel were not prevented in any way from presenting their client's case. The court granted them recesses in which to confer with their client and time for any need she had to confer with them. Neither had any witnesses to present to contest the state's case. Counsel throughout the trial were able to cross-examine all witnesses and to present and argue Angela's case. At the conclusion of the trial, Angela, through her counsel, stated to the court that she loved her son and was sorry that she was not able to provide him a home. She approved of the placement with her uncle and aunt.
The court concludes that all of the factors to be considered by the court under a Matthews analysis support proceeding to trial. The likelihood of an erroneous termination decision is slight in view of the substantial evidence predating Angela D.'s incompetence. That remote possibility is greatly outweighed by the child's needs, the evidence available from the time just prior to Angela's injury and the opportunity for counsel and her guardian to prepare with her assistance at that time. The court concludes that the due process protections to which she is entitled have been provided to Angela D. in the conduct of this CT Page 4227 trial. Permitting any further delay, in addition to the three months already provided, will not necessarily result in any further improvement in Angela D.'s condition and Adam's best interests require the court to proceed without further delay.
3. ADJUDICATION
As to the grounds alleged against Angela D., the court finds by clear and convincing evidence that Adam was adjudicated a neglected and uncared-for child on January 19, 1996 and that his mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in his life. Connecticut General Statutes § 17a-112 (c)(3)(B). The court further finds, by clear and convincing evidence, that Steven S. has also failed in his rehabilitative efforts. Both parents have not taken the necessary steps to address the issues which prevent them from being able to parent their child. Angela has made more efforts than Steven, but her addiction problems, until the time of her injury in January of 1998, remained. As of the adjudicatory date of March 27, 1997, neither parent had achieved rehabilitation and the court further concludes from the clear and convincing evidence that these circumstances had existed for more than a year prior to the filing of the petition.
Further the court finds from the clear and convincing evidence that Steven S. abandoned his son, Adam. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare."In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14,438 A.2d 801 (1981). This ground focuses on the parent's conduct. In reMichael M., 29 Conn. App. 112, 614 A.2d 832 (1992); In re Rayna M.,13 Conn. App. 23, 36, 534 A.2d 897 (1987); In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993). Steven had, as of March 27, 1997, not visited with his son in over a year. He did not inquire about Adam or take any steps to maintain his relationship with Adam. The fact of his abandonment had existed for more than a year prior to the filing of the termination petition on March 27, 1997.
4. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e) concerning both CT Page 4228 biological parents:.
1) Timeliness, nature and extent of services offered and made available to the parents and the child in order to facilitate the reunion of the child with the parent; DCF offered intensive reunification services to keep this family together from the time of the child's birth, as previously found. By 1993, neither parent was fully willing to benefit from those services. Angela D. received extensive assistance for her substance abuse problems, Steven S. received counseling and other assistance, from which he was unwilling and unable to benefit. Adam himself also received extensive services. Steven S. was unavailable for any services for reunification after the neglect adjudication. Such efforts continued for Angela, based on the clear and convincing evidence, until the finding on December 20, 1996 by the court that reunification efforts were no longer appropriate. Even after that date, Angela continued to have contact with her son and receive services.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds from the clear and convincing evidence that Steven S. was not available for the delivery of such services and to offer them would have been futile.
3) The terms of an applicable court order entered into and agreed upon by any individual agency and the parent and the extent to which all parties have fulfilled their obligations under such order; Court expectations were set for both parents. While Angela D. has done her best to meet them, she had been unable to successfully address her drug addiction. Steven S. did not address his counseling needs and the issues that prevented him from being able to parent his child.
4) Finding as to the feelings and emotional ties of the child with respect to the parents and foster parents: Adam views his maternal relative foster parents as his mother and father; he has no positive ties to his mother and father. His maternal great uncle and aunt are committed to caring for him until he becomes an adult, and wish to adopt him.
5) Finding regarding the age of the child. Adam will be seven years old on May 5, 1998. CT Page 4229
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with his parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As has previously been found, the father's contact with Adam has ended. Neither he nor Angela D. have been able to make changes in their circumstances to be able to parent Adam. Nor is there any hope that they will be able to any time in the future.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. While visitation was available to both parents until August of 1996, the visitation exercised by the mother was actively harmful to the child. Steven S. did not request contact with his son. The court finds neither parent was prevented by DCF from having a reasonable relationship with their son; their own gross parenting deficits prevented that relationship. No unreasonable conduct is noted.
5. DISPOSITION
Adam is flourishing in his present home. He is beginning to overcome the emotional damage he suffered while being raised by his biological parents. He is doing well in school with the special supports that have been provided to deal with his specialized needs. Dr. Randall has testified that he needs the permanency, stability and consistency provided by his present placement. The court finds, based on the clear and convincing evidence, that it is in Adam's best interests to terminate his parents' rights to him. These findings are made after considering the special needs of this child, the length of time he had been separated from his parents, as well as his demonstrated need for a secure and permanent environment. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has also held, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." Inre Alexander v., 25 supra, 748; see generally, JOSEPH GOLDSTEIN,ET AL., BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979.
CT Page 4230
It is hereby ORDERED that the parental rights of Angela D. and Steven S. are terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. As the foster parents wish to adopt Adam, the court directs they be given first consideration. Further, a permanency plan for Adam shall be submitted within ninety days. A review plan for him shall be filed in accordance with state and federal law.
Barbra M. Quinn, Judge Child Protection Session
[2] A disorder of the brain characterized by almost complete deprivation of oxygen with cellular destruction of the basal ganglia (at the base of the cerebral hemisphere).